# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
## HARRISONBURG DIVISION

| | | |
|---|---|---|
| **ANNA M. COWLES,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Civil Action No. 5:12-CV-129** |
| | ) | |
| **CAROLYN W. COLVIN,**[1] | ) | |
| **Acting Commissioner of Social Security,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## REPORT AND RECOMMENDATION

Plaintiff Anna M. Cowles ("Cowles") filed this action challenging the final decision of the Commissioner of Social Security ("Commissioner") determining that she was not disabled and therefore not eligible for supplemental security income ("SSI"), and disability insurance benefits ("DIB") under the Social Security Act ("Act"). 42 U.S.C. §§ 401–433, 1381–1383f. Cowles, acting *pro se*, filed a brief detailing her various medical conditions, which the court liberally construes as a general argument that the decision of the Administrative Law Judge ("ALJ") is not supported by substantial evidence. Cowles does not direct the court's attention to any specific facts the ALJ improperly failed to consider or wrongfully rejected. Rather, Cowles submissions merely recite why she believes she is disabled.

This court has jurisdiction pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3). This case is before me by referral pursuant to 28 U.S.C. § 636(b)(1)(B). The parties have fully briefed and argued all issues, and the case is ripe for decision. I have carefully reviewed the administrative record, the legal memoranda, the arguments of counsel, and the applicable law. I conclude that

---

[1] Carolyn W. Colvin became the Acting Commissioner of Social Security on February 14, 2013. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Carolyn W. Colvin is hereby substituted for Michael J. Astrue as the defendant in this suit.

substantial evidence supports the ALJ's decision as a whole. Accordingly, I **RECOMMEND GRANTING** the Commissioner's Motion for Summary Judgment. Dkt. No. 16.

## STANDARD OF REVIEW

Section 405(g) of Title 42 of the United States Code authorizes judicial review of the Commissioner's denial of social security benefits. Mastro v. Apfel, 270 F.3d 171, 176 (4th Cir. 2001). This court limits its review to a determination of whether substantial evidence exists to support the Commissioner's conclusion that Cowles failed to demonstrate that she was disabled under the Act. "Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion; it consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." Craig v. Chater, 76 F.3d 585, 589 (4th Cir. 1996) (internal citations omitted). The final decision of the Commissioner will be affirmed where substantial evidence supports the decision. Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990).

Cowles bears the burden of proving that she is disabled within the meaning of the Act. English v. Shalala, 10 F.3d 1080, 1082 (4th Cir. 1993) (citing 42 U.S.C. § 423(d)(5)). The Act defines "disability" as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment, which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). Disability under the Act requires showing more than the fact that the claimant suffers from an impairment which affects her ability to perform daily activities or certain forms of work. Rather, a claimant must show that her impairments prevent her from engaging in any and all forms of substantial gainful employment given the claimant's age, education, and work experience. See 42 U.S.C. § 423(d)(2).

The Commissioner uses a five-step process to evaluate a disability claim.  Walls v.
Barnhart, 296 F.3d 287, 290 (4th Cir. 2002).  The Commissioner asks, in sequence, whether the
claimant: (1) is working; (2) has a severe impairment; (3) has an impairment that meets or equals
the requirements of a listed impairment;[2] (4) can return to her past relevant work; and if not, (5)
whether she can perform other work.  Johnson v. Barnhart, 434 F.3d 650, 654 n.1 (4th Cir. 2005)
(per curiam) (citing 20 C.F.R. § 404.1520); Heckler v. Campbell, 461 U.S. 458, 460–62 (1983).
The inquiry ceases if the Commissioner finds the claimant disabled at any step of the process.  20
C.F.R. § 404.1520(a)(4).  The claimant bears the burden of proof at steps one through four to
establish a prima facie case for disability.  The burden shifts to the Commissioner at the fifth step
to establish that the claimant maintains the residual functional capacity ("RFC"), considering the
claimant's age, education, work experience, and impairments, to perform available alternative
work in the local and national economies.  42 U.S.C. § 423(d)(2)(A); Taylor v. Weinberger, 512
F.2d 664, 666 (4th Cir. 1975).

In cases such as this, where the claimant has submitted additional evidence to the
Appeals Council, and the Appeals Council considered that evidence, this court must review the
record as a whole, including the new evidence, to determine whether substantial evidence
supports the Commissioner's findings.  Wilkins v. Secretary, Dep't of Health and Human Servs.,
953 F.2d 93, 95–96 (4th Cir. 1991).

## STATEMENT OF FACTS

### Social and Vocational History

Cowles was born on March 25, 1958 (Administrative Record, hereinafter "R." at 356),
and was a "person closely approaching advanced age" on her alleged onset date and at the time

---

[2] A "listed impairment" is one considered by the Social Security Administration "to be severe enough to
prevent an individual from doing any gainful activity, regardless of her or her age, education, or work experience."
20 C.F.R. § 404.1525(a).

of the ALJ's decision. R. 302; 20 C.F.R. §§ 404.1563(d), 416.963(d) Cowles' last insured date is June 30, 2011. R. 49, 303, 356. She must show that her disability began before that date and existed for twelve continuous months to receive DIB. 42 U.S.C. §§ 423(a)(1)(A), (c)(1)(B), (d)(1)(A); 20 C.F.R. §§ 404.101(a), 404.131(a). Cowles has a high school education and reportedly obtained an unspecified real estate certification in 2002. R. 70, 308. Cowles has previously worked as a cleaner, fast food worker, waitress, general clerical worker, and bartender. R. 97, 116, 308, 317. These positions were classified by vocational experts as unskilled or semi-skilled, and ranged from work at the sedentary to light exertion levels. R. 97, 116. Cowles reported that during the relevant period, she had the capacity to perform a wide range of daily activities. These activities included preparing meals daily, cleaning the house, playing with her grandchildren, watering plants, feeding birds, doing laundry, washing dishes, going outside daily, driving a car, shopping for food, handling her personal finances, and visiting her neighbors. R. 347–52. Cowles reported having no difficulty with her personal care, including dressing, bathing, and feeding herself. R. 348.

## Claim History

This is the second of a series of applications for benefits filed by Cowles. On April 1, 2008, Cowles filed for SSI and DIB benefits, alleging disability beginning April 12, 2004. R. 109. Following an administrative hearing, the ALJ issued a decision dated August 27, 2010 finding Cowles not disabled and denying her claims for benefits. R. 109–118. Cowles did not appeal this decision. R. 48.

In the instant claim, Cowles protectively filed for SSI and DIB on September 7, 2010, originally claiming a disability onset date of April 12, 2004. R. 48, 280–92, 303. The Commissioner denied the application at the initial and reconsideration levels of administrative review. R. 209–17. On August 28, 2012, Administrative Law Judge ("ALJ") Donna Dawson

held a hearing to consider Cowles' disability claim. R. 65–105. Cowles was represented by an attorney at the hearing, which included testimony from Cowles and vocational expert Carol Reid. R. 66. Through her attorney at the time, Cowles moved to amend her alleged onset date to August 28, 2010, the day after the ALJ's unfavorable decision in her initial claim. R. 75–76. The ALJ accepted this amendment. R. 76.

On September 13, 2012 the ALJ entered her decision denying Cowles' claims. R. 48–59. The ALJ found that Cowles suffered from the severe impairments of degenerative disc disease of the cervical and lumbar spine with multilevel disc bulging/protrusion and mild neuropathy; degenerative joint disease of the bilateral knees; fibromyalgia; tendinopathy of the left rotator cuff; bilateral hip osteopenia subsequent to a pelvic fracture; generalized anxiety disorder; and major depression. R. 51. The ALJ found that these impairments, either individually or in combination, did not meet or medically equal a listed impairment. R. 52–54. The ALJ further found that Cowles retained the RFC to perform light work, except that she is limited to:

> work requiring no more than occasional climbing of stairs/ramps, stooping, kneeling, crouching, and crawling, no more than frequent balancing, no climbing of ropes/ladders/scaffolds, in an environment in which she may change positions (from sitting to standing/walking and vice versa) for two to three minutes each hour while remaining at the workstation. Additionally, as a result of her physical symptoms and medication side effects, the claimant should avoid concentrated exposure to extreme cold, wetness, fumes, odors, dusts, gases, poor ventilation and other pulmonary irritants, as well as to hazardous machinery and heights. Due to moderate concentration deficits associated with her mental impairments, the claimant is further limited to simple, routine work.

R. 54. The ALJ determined that Cowles could not return to her past relevant work as a waitress, bartender, and clerical worker (R. 57), but that Cowles could work at jobs that exist in significant numbers in the national economy, such as a packer, inspector, and cashier. R. 58. Thus, the ALJ

concluded that she was not disabled. R. 59. On December 5, 2012, the Appeals Council denied Cowles' request for review (R. 1–5), and the present appeal followed.[3]

## ANALYSIS

On appeal, Cowles, acting *pro se*, does not make any specific argument as to why the ALJ erred in finding her not disabled. Cowles filed a brief detailing her physical and mental conditions, as well as personal background, which the court liberally construes to argue that the ALJ's decision is not supported by substantial evidence. For the reasons that follow, I conclude that there is substantial evidence in the record that supports the ALJ's conclusion that Cowles was not disabled during the relevant period.

### Relevant Period

In her brief, Cowles asks for an award of benefits from April 2008. Pl.'s Br. Summ. J. 4. However, the record shows that the relevant period for this appeal springs from August 28, 2010. At the administrative hearing, Cowles—then represented by an attorney—moved to amend her alleged onset date of disability from April 12, 2004 to August 28, 2010 because she "[didn't] actually have records going back to 2004 to support that particular onset date." R. 75. Notably, this amended onset date represents the day after the ALJ's unfavorable decision in her initial benefits application.

The doctrine of *res judicata* also bars consideration of benefits for a period prior to August 28, 2010, as found by the ALJ in the instant claim. R. 48. Cowles did not appeal the ALJ decision dated August 27, 2010 denying her prior disability claim, making that decision final and binding that she was not disabled through the date of the ALJ decision. Thus, *res judicata*

---

[3] Ultimately, based on a third application for benefits on December 11, 2012, Cowles was awarded SSI from April 2013. Def.'s Br. Summ. J., Exhibit A.

6

precludes consideration of the issue of disability prior to August 27, 2010. See, e.g., Blankenship v. Astrue, 7:07CV503, 2009 WL 87411, at *2 (W.D. Va. Jan. 12, 2009).

For these reasons, the relevant period for this appeal is between August 28, 2010 and September 13, 2012, the date of the ALJ's opinion in the instant claim. Thus, the issue before this Court is whether substantial evidence supports the ALJ's finding that Cowles was not disabled during this period.

Relevant Evidence Before the ALJ

*Medical Evidence*

Cowles's appeal of the ALJ's decision to this court generally challenges that substantial evidence does not support the denial of benefits. To understand the ALJ's decision, it is necessary to review the medical evidence of record during the relevant period as well as the opinion evidence. The record shows that Cowles has a history of generalized back and knee pain, along with other physical impairments. Cowles attributes the onset of her physical problems to motor vehicle accidents in 1993 and 2004. R. 11, 72, 620, 719. Secondary to her physical impairments and family circumstances, Cowles began reporting symptoms of anxiety and depression starting in the mid-2000s. R. 73.

On October 12, 2010, Cowles reported back and neck pain at a visit to St. Luke Community Clinic ("Community Clinic") and was diagnosed with degenerative joint disease. R. 494. Cowles was prescribed Neurontin, and underwent x-rays of the cervical spine which showed that Cowles had normal alignment and that vertebral body heights were maintained. R. 468. The imaging showed mild disc space narrowing and degenerative changes at the C6-C7 level. Furthermore, the neural formina were widely patent, there was no fracture or subluxation, and prevertebral soft tissues were unremarkable. R. 468. After a follow up at the Community

Clinic in November 2010, Cowles was referred to physical therapy due to neck and upper back pain that was radiating to her right arm and leg. R. 478, 527.

Cowles saw physical therapist Clint Kalbach on December 2, 2010 for an initial physical therapy evaluation, and Kalbach assessed neck pain, lumbar radiculopathy, cervical radiculopathy, thoracic pain, and degenerative joint disease. R. 492. Kalbach observed limited and painful range of motion in Cowles' lumbar and cervical spine and found that Cowles would benefit from physical therapy. R. 492. Treatment records show that Cowles responded well to physical therapy initially (R. 538) but that she discontinued physical therapy due to increased extremity pain by December 22, 2010.  R. 541, 543.

An MRI of Cowles cervical spine was taken on December 6, 2010. R. 488. The MRI revealed that Cowles had "[r]ight paracental disc protrusion at C6-7 with multilevel degenerative disc disease from C3-4 through C5-6" and that "[m]oderate neural foraminal narrowing at C6-7 on the right side may account for patient radiculopathy." R. 488.

Cowles was seen in the emergency room in March 2011 after falling and reported knee pain, neck pain, and arm numbness and tingling. R. 569. She reported that her medication was not controlling her pain. R. 569. On examination, Cowles' neck was non-tender and had painless range of motion. R. 571. There were no signs of tenderness in her back, and she had a normal range of motion in her extremities. R. 572. Carlos J. Martinez, M.D. diagnosed neck pain and muscle spasms, and Cowles was prescribed pain medication and an anti-inflammatory. R. 572. At a subsequent visit to urgent care on May 2, 2011 for chronic pain, Cowles' physical exam was normal with the exception of generalized back pain. R. 584. Cowles was prescribed Prednisone and Tramadol. R. 586.

Cowles saw neurologist Kenneth Leone, M.D., at UVA in June 2011 reporting that her chronic neck pain had worsened over the past year, and that she also experienced low back and

pelvis pain that makes it difficult for her to walk. R. 504. Dr. Leone noted that Cowles had tenderness in her back muscles and right trapezius with a supple neck, "fairly full range of motion" and intact extremity sensation. R. 505–506. Dr. Leone wrote that "[t]he patient demonstrates diffuse give-away weakness without any true weakness present as far as I can tell." R. 506. Dr. Leone diagnosed Cowles as having chronic pain syndrome, but noted that neurologically, there were no objective abnormalities upon examination. Dr. Leone recommended a switch in medication. R. 506. Dr. Leone suspected cervical radiculopathy, but results of nerve conduction studies were normal, showing no electrophysiological evidence of right cervical radiculopathy. R. 511–15. As a result of these benign findings, Dr. Leone found it appropriate to refer Cowles to UVA's Pain Management Center. R. 516.

Cowles underwent a Dexa Scan to evaluate her bone density on June 21, 2011. R. 589–90. The scan found that the bone density in Cowles' lumbar spine was consistent with osteoporosis, and bone density in both hips consistent with severe osteopenia. Patricia Ann Daly, M.D., suggested "optimization of calcium with vitamin D intake and smoking cessation" as well as antiresorptive therapy. R. 589. In September 2011, a CT scan of Cowles' abdomen and pelvis was normal. R. 733. A radiograph of Cowles' right hip showed no acute process or significant osteoarthritic change, although it also showed irregularity in Cowles' pubic bone, which had been broken in a motor vehicle accident. R. 899.

In December 2011, Cowles continued to report neck and back pain, rated as "9/10" and she was diagnosed with fibromyalgia. R. 653–54. She was referred for lab work, which came back negative except for her sedimentation rate. R. 649. At a subsequent visit to the Community Clinic, Cowles was assessed with arthritis after presenting with swollen red joints in her right hand. R. 649. Cowles was prescribed Arthrotec and was referred to UVA's rheumatology department.

On January 13, 2012, Cowles saw Daniel L. Zimet, M.D. for a chief complaint of right hip pain. R. 645. Dr. Zimet found Cowles well developed, with an antalgic gate and full hip range of motion, although right flexion caused mild pain. Dr. Zimet found sensation, reflexes, motor function, and pulses to be normal, as well as her left hip. Dr. Zimet noted tenderness at her pubic symphysis, and noted that x-rays revealed a fusion across the bone. R. 645. Dr. Zimet diagnosed right hip osteotis pubis, status post remote trauma and fusion of the pubic disc, and stated that there was "no treatment for this entity." R. 645. Dr. Zimet prescribed the pain medication Norco.

Cowles obtained MRIs on both knees, as well as her lumbar spine, cervical spine, and left shoulder in February 2012. In her left knee, images showed some cartilage irregularity with small subchrondral cysts around the patella, as well as a small subchondral lesion of her medial femoral condyle. R. 630. In her right knee, images showed significant cartilage loss. R. 631. Ligaments in both knees were intact. Images of her spine showed a small left paramedian disc protrusion at L5-S1, a right-sided disc protrusion at C5-6, and a left sided disc protrusion at C6-7. R. 623–26. The MRI of her left shoulder showed rotator cuff tendinopathy without any tears. R. 627–28. The Community Clinic referred Cowles to Dr. Zimet for her knee and shoulder pain, and to UVA Neurology for her back pain. R. 778.

On March 15, 2012, Cowles again saw Dr. Zimet, this time with knee pain as her chief complaint. R. 620. Dr. Zimet observed Cowles' gait pattern to be normal, with no effusion and full range of motion in both knees. Physical test results were normal. Based on MRI images, Dr. Zimet diagnosed mild degenerative joint disease of both knees and again prescribed Norco. Dr. Zimet wrote that "[s]he should be managed medically and does not need orthopaedic [sic] follow up for this problem in the near future." R. 620.

Cowles visited UVA Neurology in April 2012, and was examined by Gregory Helm, M.D., Ph.D. R. 771. Dr. Helm found Cowles' to be "grossly neurologically intact." After reviewing Cowles' MRI results, Dr. Helms remarked that "[h]er lumbar region looks quite good. Her cervical region demonstrates some degenerative changes at several levels, but these don't correlate well with her symptoms." R. 771. Dr. Held recommended a cervical epidural steroid injection. Cowles saw Gregory Morell, P.A.-C., on April 30, 2012, who observed Cowles to be in "mild pain" with a normal physical examination, with the exception of pain with neck rotation and extension. R. 741. Morell assessed neck pain and prescribed Ultram. R. 741–42.

Cowles was next examined by Mark Landrio, M.D., at Neurologic Associates on May 14, 2012 for neurological testing. R. 719–25. As the result of the tests, Dr. Landrio found:

1. Very mild bilateral median neuropathies localized to the carpal tunnel–right greater than left.

2. Mild right ulnar neuropathy localized to the cubital tunnel.

3. Moderately reduced left ulnar and trivially reduced left radial sensory conduction velocities [that] were a consequence of reduced distal temperature.

4. A mild and chronic C6 radiculopathy affecting the left upper extremity.

5. There is no electrophysiologic evidence for cervical radiculopathy affecting the right upper extremity or for a generalized polyneropathy affecting the large fibers based on the studies performed.

R. 723.

Also in May 2012, Cowles received a cervical epidural steroid injection. R. 738–39. Notes from Alok Gopal, M.D. described the injection as medically necessary because Cowles' chronic pain "failed to respond or poorly responded to non-interventional and non-surgical conservative management." R. 739. Cowles soon reported less pain since the injection and greater range of motion, and was referred again for physical therapy.

11

R. 762. Cowles asked for short acting pain medication prior to starting therapy, but due to problems with side effects, Dr. Gopal prescribed long-acting morphine sulfate. R. 736–37. On June 16, 2012, Cowles claimed that the prior month's injection caused increased symptoms and headaches. R. 831.

Cowles restarted physical therapy in June 2012, and reported that she "felt really good" after the initial session. R. 823. Cynthia Stevens, P.T. noted on June 25, 2012 that Cowles had "[g]ood tolerance to increased weight during exercises." R. 823. On June 29, 2012, Cowles reported that her neck was feeling better overall, but with some stiffness on the left side. R. 820. Again on July 6, 2012, Cowles stated that her neck was feeling "a lot better." R. 818. Despite these improvements, Cowles ceased physical therapy soon thereafter.

On June 26, 2012, Cowles saw George Van Osten, M.D. for medication refills and chronic opioid therapy, and stated that morphine provided good pain control but caused insomnia. R. 878. Cowles' physical examination was unremarkable, and she was told to take her morphine in the morning rather than in the evening to help her sleep and manage daytime pain. R. 879–80. At a later visit, Cowles admitted lying about her past substance abuse history, and Dr. Van Osten expressed concern for potential addiction. R. 875–77.

As to her mental impairments, Cowles was being seen by mental health providers at the Community Clinic shortly after her alleged onset date. On September 20, 2010, Cowles' mental status evaluation was largely normal, and she reported that her mood was "pretty good." R. 497. She was diagnosed with major depression, polysubstance dependence, generalized anxiety disorder, and a Global Assessment of Functioning ("GAF") of 55.[4] Cowles requested a

---

[4] The Global Assessment of Functioning is a numeric scale ranging from 0 to 100 used by mental health professionals to rate social, occupational and psychological functioning "on a hypothetical continuum of mental health illness." Diagnostic and Statistical Manual of Mental Disorders, 32 (4th Ed. Am. Psychiatric Ass'n 1994) ("DSM IV"). A score of 51–60 suggests moderate symptoms or difficulty in social or occupational functioning. Id.

psychiatric referral, and when asked why, she responded "because the…disability judge told me that I need ongoing care by a psychiatrist." R. 497. At an October 2010 visit, Cowles reported that her mood had improved some, although she continued to have periods of depressed feelings. R. 493. Cowles stated that she believed Paxil helped and that her current dosage was adequate. Again, Cowles' mental status exam was normal and she was continued on Paxil. R. 493.

On December 13, 2010, Cowles reported that "her mood is generally pretty good" and that from a psychiatric standpoint things were going well "other than the fact that her finances are poor." R. 476. On March 14, 2011, Cowles reported that her symptoms had increased, but other than her depressed mood, her mental status examination was normal. R. 474. Cowles reported continued problems, as well as irritability from Paxil, on April 4, 2011. R. 473. Cowles was tapered off Paxil and prescribed Cymbalta instead. R. 472–73. By the end of April 2011, Cowles' mood had improved on Cymbalta, and she reported that she had more energy. R. 470.

Cowles did not again receive mental health treatment until October 17, 2011, when she met with Michele Moore, PMHNP-BC, at Northwestern Community Services. R. 661–62. Cowles admitted that she had been off all medication for two months. Moore noted Cowles to be extremely agitated throughout the initial interview, that she had tangential and circumstantial thought process, and poor insight and judgment. R. 661–62. Moore diagnosed major depression, polysubstance dependence, generalized anxiety disorder, and a GAF of 50. Moore prescribed Seroquel and instructed Cowles on the necessity of medication compliance. R. 662. Just a week later, Cowles had already reported that her new medication was helping her to keep calmer and did not have any complaints psychiatrically. R. 659. Moore's mental status evaluation noted that Cowles' "demeanor has changed rather dramatically" and that her mood had improved. R. 659. Other than being tense due to pain, the mental status examination was normal with a GAF of 55.

At a visit on November 21, 2011, Moore described Cowles' as "labile and agitated." R. 657. Moore increased her dosage of Seroquel (R. 658) and a week later Cowles was much calmer and her mental status exam was again largely normal. R. 655. Moore adjusted her dosage upward again in hopes of continued mood improvement. R. 656. On December 12, 2011, Cowles reported that her mood was "fine" and that sometimes she was agitated by her living situation. R. 650. Moore's mental status examination of Cowles was largely normal, and Cowles was continued on the same dosage of Seroquel. R. 650–51. Cowles' mental health was again stable on medication at a visit on January 5, 2012. R. 646–47. On February 6, 2012, Cowles stated that she was "depressed over her living situation." R. 632. With the exception of a depressed mood, Cowles' mental status examination was normal, and Moore continued her on Seroquel. R. 632.

When Cowles saw Gregory Morell, P.A.-C. on April 30, 2012, Morell's mental status examination was completely normal. R. 741. Treatment notes from the Community Clinic on May 21, 2012 reflect that Cowles stopped Seroquel and hadn't sought mental health treatment for several months. R. 763. At that time Cowles was described as very animated and manic. On June 4, 2012, Cowles explained to Moore at the Community Clinic that she took herself off the medication because she was worried about weight gain and cholesterol levels. R. 744. However, Cowles later reported that she stopped Seroquel because she was taking morphine. R. 825.

*Testimony*

Cowles testified at the administrative hearing that her primary reason for applying for disability was because of her physical conditions. R. 72. Cowles described her knee pain as "very bad," and that because of osteoporosis and osteopeneia, she had difficulty standing and sitting for any length of time. R. 72. She further stated that she has "neck problems and a pinched left shoulder" as well as pain and numbness in her left arm and hand that prevents her from carrying a piece of paper. R. 72, 80–81. She stated that her physical pain was constant and present every

14

day, and is exacerbated depending on how she uses her body. R. 78–80. As to her mental impairments, Cowles testified that as a result of a tumultuous marriage and family hardships, she had been prescribed anti-depressants. R. 73–74. Cowles said that "I'm pretty much a recluse now and I really don't care to be around anybody," and "I usually don't even get out of my night clothes unless I have to go somewhere." R. 85, 93.

At the hearing, the ALJ asked the vocational expert to contemplate a hypothetical individual of Cowles' age, education, and work experience, and asked whether that person could perform the range of unskilled, light work with the additional restrictions in the RFC contained in his written decision. R. 54, 98–100. The vocational expert concluded that the hypothetical individual could perform this level of work, which included jobs in significant numbers in the national economy such as a packer, inspector, and cashier. R. 99–100.

*Opinion Evidence*

The record contains several medical opinions as to Cowles' functional ability; however none are from Cowles' treating sources. On June 6, 2008, consultative physician Seth Turwiner, M.D, found that Cowles could stand, sit, and walk during a workday without limitation, had no postural or manipulative limitations, and had no weight lifting limitations. R. 128. At the initial consideration level in December 2010, state agency physician William Amos, M.D. noted that Dr. Turwiner's opinion was dated and did not reflect worsening in Cowles' impairments, and was therefore "without substantial support from the other evidence of record." R. 132. Dr. Amos found that Cowles could only occasionally lift and/or carry 20 pounds, frequently lift and/or carry 10 pounds, stand and/or walk for six hours in an 8-hour workday, sit for six hours in an 8-hour workday, and had unlimited pushing and/or pulling ability. R. 132–33. Moreover, Dr. Amos found that Cowles could only occasionally climb ramps and stairs; occasionally climb ladders,

ropes, and scaffolds; and occasionally stoop, kneel, crouch, and crawl. R. 133. Dr. Amos did not find any manipulative or environmental limitations. R. 133–34.

Upon reconsideration on September 23, 2011, state agency physician Thomas M. Phillips, M.D. made similar findings to Dr. Amos. R. 183–85. However, Dr. Phillips imposed additional environmental limitations, to include avoiding concentrated exposure to extreme cold; wetness; fumes, odors, dusts, gases, and poor ventilation; and hazards such as machinery and heights. R. 184–85. State agency physician Robert Mitgang, M.D. reviewed Cowles' file on March 13, 2012. R. 617. Dr. Mitgang found that although Cowles could not do her part-time relevant work due to nonexertional limitations, she would be capable of performing work up to the light range with limited public contact. R. 617.

On March 15, 2012, state agency psychologist Tawnya Brode, Psy.D., reviewed Cowles' history and found that Cowles was not disabled by her mental impairments, but that they would affect her ability to socialize as accommodated by the previous ALJ decision on August 27, 2010. R. 616–17. The RFC in this prior decision limited Cowles' interaction with peers, the public, and supervisors to two-thirds of an 8-hour workday. R. 114.

## Discussion

This extensive record provides substantial evidence in support of the ALJ's decision that Cowles was not disabled between August 28, 2010 and September 13, 2012. While the medical evidence established the existence of several physical and mental impairments, the evidence fails to establish corresponding functional loss rising to the level of total disability during the relevant period. The medical record shows that Cowles was diagnosed with disorders in her back, knees, hips, and shoulder, as well as anxiety and depression. However, "[t]he mere diagnosis of an impairment does not establish that a condition is disabling; there must be a showing of related

functional loss." <u>Hawkins v. Astrue</u>, C.A.8:08-3455HMHBHH, 2009 WL 3698136, at *4 (D.S.C. Nov. 3, 2009) (citing <u>Gross v. Heckler</u>, 785 F.2d 1163, 1165 (4th Cir.1986)).

The overwhelming evidence from Cowles' treating physicians—including specialists in their respective fields—reveals largely mild medical findings, including records from Drs. Helms (R. 771), Zimet (R. 620), Landrio (R. 723) and Leone (R. 516). Physical examinations from the relevant period were unremarkable and not corroborative of the subjective complaints that brought Cowles to providers in the first place. R. 505–506, 571, 584, 620, 723, 741, 771, 879–80. For example, Dr. Leone found after a thorough examination in June 2011 that "[n]eurologically, there are no objective abnormalities" and that Cowles did not exhibit any "true weakness" as far as he could discern. R. 506. Neurologist Dr. Helms found after examination and reviewing MRIs that Cowles' lumbar region "look[ed] quite good" and that her cervical region had some degenerative changes that "didn't correlate well with her symptoms." R. 771. Additionally, Cowles' course of treatment was primarily conservative with the exception of on back injection during the relevant period. R. 738–39. With regard to Cowles' knee pain, Dr. Zimet recommended that Cowles "be managed medically" and did not need follow up. R. 620.

Similarly, evidence regarding Cowles' mental impairments failed to demonstrate disabling symptoms. Cowles routinely had unremarkable mental status examinations and GAF scores during the relevant period suggesting no more than moderate limitation in social and occupational functioning. R. 470, 474, 476, 493, 497, 632, 641, 646–47, 650–51. Cowles' symptoms decreased when she was compliant with her anti-depressant medication, and the two periods when her mental health regressed the most occurred when Cowles was admittedly noncompliant with doctors' orders. Cowles' lowest point perhaps was in October 2011 when she had been off her medication for two months. R. 661. After resuming her medication regimen, Cowles showed marked improvement in just a week, when she did not have any psychiatric

complaints. R. 659. Likewise, on May 21, 2012 Cowles appeared manic at the Community Clinic only after a second hiatus from her medication. R. 763. This pattern shows that when compliant, medication helped control Cowles' symptoms. "If a symptom can be reasonably controlled by medication or treatment, it is not disabling." <u>Gross</u>, 785 F.2d at 1166 (citations omitted). Moreover, the opinion of state agency psychologist Dr. Tawnya Brode suggested only mild-to-moderate limitation in social functioning accommodated by the RFC. R. 616–17.

While the notes of Cowles' treating physicians document her subjective complaints of pain and symptoms, her "statements to physicians by way of history or complaint do not constitute objective medical evidence, and the recording of a claimant's complaints by a physician does not transform those complaints into objective clinical evidence." <u>King v. Barnhart</u>, 6:04CV00053, 2005 WL 3087853, at *4 (W.D. Va. Nov. 16, 2005) (citing <u>Craig v. Chater</u>, 76 F.3d 585, 590 n. 2 (4th Cir.1984)). Despite the lack of objective medical evidence corroborating Cowles' claim of disability, the ALJ found that Cowles retained an RFC limited to light work with numerous different additional postural, environmental mental limitations. R. 15. Moreover, The ALJ's hypothetical question to the vocational expert regarding jobs available to an individual of Cowles' age, education, and work experience reasonably accounted limitations established by the evidence. R. 99–104. Thus, the Commissioner met its burden at step five by establishing through the testimony of the vocational expert that a significant number of jobs existed of which Cowles could perform.[5] R. 58–59.

---

[5] Cowles' suggestion that she should have been deemed disabled under Medical-Vocational Guideline Rule 202.06 is unavailing because she was not a person of "advanced age" at the time of the ALJ's decision. On September 12, 2012, she was more than six months from aging into that category under the regulations. <u>See</u> 20 C.F.R. § 404.1563; 20 C.F.R. Pt 404, Subpart P, Appendix 2. <u>See also</u> 20 C.F.R. §§ 404.1563(b) & 416.963(b) ("If you are within a *few days to a few months* of reaching an older age category…we will consider whether to use the older age category after evaluating the overall impact of all the factors of your case."); <u>Dunn v. Astrue</u>, 7:11-CV-132-FL, 2012 WL 7748800, at *8 (E.D.N.C. Aug. 9, 2012) (finding that where claimant turned 55 years old almost seven months after the ALJ's decision, claimant was properly considered an "individual closely approaching advanced age").

Cowles' subjective complaints of disabling symptoms are not conclusive. Rather, the ALJ must examine all of the evidence, including the objective medical record, and determine whether Cowles has met her burden of proving that she suffers from an underlying impairment which is reasonably expected to produce her claimed symptoms. Craig, 76 F.3d at 592–93. A reviewing court gives great weight to the ALJ's assessment of a claimant's credibility and should not interfere with that assessment where the evidence in the record supports the ALJ's conclusions. See Shively v. Heckler, 739 F.2d 987, 989–90 (4th Cir. 1984). Given these well-established principles, and the evidence in the record before the ALJ, I decline to disturb the ALJ's finding that Cowles' "statements concerning the intensity, persistence and limiting effects of [her] symptoms are not credible to the extent they are inconsistent with the…residual capacity assessment." R. 55.

Substantial evidence supports the ALJ's finding that Cowles' was not entirely credible. The record shows that Cowles was not forthright to her doctors about her substance abuse history (R. 875–77) and when Cowles sought a psychiatric referral, her motivation appeared to be a desire primarily to seek disability benefits rather than treatment. R. 497. Further undermining the credibility of Cowles' subjective complaints is her self-reported ability to perform a plethora of activities of daily living suggestive of less than debilitating symptoms from her ailments. In her disability application, Cowles reported that she routinely prepared meals, performed chores, went outside, visited her neighbors, and had no difficulties with her personal care. R. 347–52. Cowles also testified that she helped care for her three-year-old grandson that she lives with, including helping feed him, brush his teeth, and read to him. R. 71. One might expect a more truncated list of daily activities if Cowles was as severely impaired as alleged.

Substantial evidence also supports the ALJ's treatment of opinion evidence in the record. The ALJ gave some, "but not great weight" to the opinions of the state agency doctors at the

initial and reconsideration stage "in light of the more recently submitted evidence of record supporting an increased level of limitation, particularly with respect to the concentration deficits repeatedly articulated in Ms. Cowles' psychological treatment notes and the claimant's observed need to physically change positions." R. 57. Moreover, the ALJ gave little weight to the consultative opinion of Dr. Turwiner from 2008, which provided for no limitations, because the opinion was from prior to the alleged onset date and did not incorporate new evidence of record. R. 57. The ALJ formulated an RFC more restrictive than any medical opinion, including a limitation of Cowles to simple, routine work and a provision that allows for changing of positions for two or three minutes each hour. R. 54. This analysis reflects reasoned consideration of the medical opinion in relationship to the entire record, including more recent treatment records. The RFC properly accounted for all of Cowles' physical and mental limitations established by the medical evidence. I find no error in this analysis and find that substantial evidence supports the ALJ's evaluation of the medical opinions of record.

Finally, in support of her claim, Cowles submitted to the Appeals Council and this Court various additional evidence, including a consultative physician's report by Benjamin V. Rezba, M.D. R. 8–43, Exhibits to Dkt. Nos. 14 & 18. Much of this evidence was already in the record before the ALJ and considered by her in her decision. The remainder of the evidence is dated either well before the relevant period or after the ALJ's decision on September 13, 2012.[6] "[I]n order for the court to properly grant a remand due to additional evidence, the additional evidence must be new, material *and relate to the period on or before the date of the ALJ's decision*." Duncan v. Astrue, 1:09CV00042, 2010 WL 723710, at *18 (W.D. Va. Feb. 26, 2010) (emphasis

---

[6] As the Appeals Council properly explained to Cowles when denying review of her claim: "The Administrative Law Judge decided your case through September 13, 2012. This new information is about a later time. Therefore, it does not affect the decision about whether you were disabled beginning on or before September 13, 2012." R. 2.

added) (citing <u>Wilkins v. Secretary of Dep't of Health & Human Servs.</u>, 953 F.2d 93, 95–96 (4th Cir.1991)). Cowles provides no explanation as to how this evidence relates back to her condition during the relevant period—on or before September 13, 2012, the date of the ALJ's opinion.

I specifically note that to the extent that Dr. Rezba's consultative report (R. 8–15) reflects a decreased level of functioning, this reduced functioning is not supported during the medical record from the relevant period. His report is based substantially in part on a physical examination performed more than one month after the ALJ's decision, and the report itself was finalized more than two months after the ALJ's decision. R. 8, 14. If Cowles' health worsened following the date of the ALJ's decision, the proper recourse was to file a new application for disability benefits—an action she has already taken, and which resulted in her receiving benefits. <u>See</u> Def.'s Br. Summ. J., Exhibit A.

<b><u>CONCLUSION</u></b>

In this civil action, the Court's role is limited to determining whether the Commissioner's decision is supported by substantial evidence, and in this case, substantial evidence supports the ALJ's opinion.  In recommending that the final decision of the Commissioner be affirmed, I do not suggest that Cowles is totally free from pain and distress.  The objective medical record simply fails to document during the relevant period the existence of conditions which would reasonably be expected to result in total disability from all forms of substantial gainful employment.  It appears that the ALJ properly considered all of the objective and subjective evidence in adjudicating Cowles' claim for benefits and in determining that her physical and mental impairments would not prevent her from performing any work. Substantial evidence supports the ALJ's decision on all grounds. For these reasons, it is **RECOMMENDED** that an order be entered **AFFIRMING** the final decision of the Commissioner, and **GRANTING** summary judgment to the defendant, and **DISMISSING** this case from the court's docket.

The Clerk is directed to transmit the record in this case to Michael F. Urbanski, United States District Judge, and to provide copies of this Report and Recommendation to counsel of record. Both sides are reminded that pursuant to Rule 72(b), they are entitled to note any objections to this Report and Recommendation within fourteen (14) days hereof. Any adjudication of fact or conclusion of law rendered herein by me that is not specifically objected to within the period prescribed by law may become conclusive upon the parties. Failure to file specific objections pursuant to 28 U.S.C. § 636(b)(1)(C) as to factual recitations or findings as well as to the conclusion reached by me may be construed by any reviewing court as a waiver of such objection.

Enter:  February 17, 2014

*Robert S. Ballou*

Robert S. Ballou
United States Magistrate Judge